CER:AJM
F.#
CHIODO.INF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

PETER CHIODO,

        Defendant.

- - - - - - - - - - - - - X

**S U P E R S E D I N G**
**I N F O R M A T I O N**

Cr. No. ~~90-446(S-1)~~ (RJD)
(T. 18, U.S.C. §§1962(d),
1963, 3571, 3623 (1984),
3579 (1982) and 3663)

CR 90-446(S-1)

THE UNITED STATES ATTORNEY CHARGES:

      Unless otherwise indicated, at all times relevant
to this Information:

      1.  The Luchese organized crime family (herein after
referred to as the "enterprise"), an association in fact whose
members and associates formed an organized criminal group that
operated in the Eastern District of New York and other parts
of the United States and that was part of a nationwide
criminal organization known by various names, including the
"Mafia" and "La Cosa Nostra," was an enterprise as that term
is defined in Title 18, United States Code, Section 1961(4).

      2.  The defendant, PETER CHIODO, was first an
associate, then a "made" member, and finally a "captain" of
the enterprise.

      3.  Between 1978 and the present, the lucrative
window replacement industry in the New York City metropolitan
area was monopolized and corruptly controlled by an enterprise

consisting of members and associates of the Genovese, Luchese Colombo and Gambino Crime Families, and the unions and window manufacturers and installers over which those crime families exercised influence and control. The principal object of the enterprise was to control the New York City Housing Authority (NYCHA) window replacement market by excluding all but a select number of window manufacturing and installation companies. The enterprise seized corrupt control of certain private sector window jobs as well.

4. One of the principal weapons used by the enterprise was Local 580 of the Architectural and Ornamental Ironworkers Union (Local 580), which was closely associated with the Genovese Crime Family until approximately 1984 when, pursuant to an inter-family agreement, it became closely associated with the Luchese Crime Family. Through inter-union agreement, Local 580 possessed union jurisdiction over the installation of metal windows. With Local 580 under the control of the enterprise, the defendants were able to exclude various window manufacturers and installation companies from contracting to manufacture and install NYCHA windows, and to discipline window manufacturing and installation companies controlled by them through fear, intimidation and threats of labor unrest. In exchange for Local 580's actions in further-ance of the enterprise, Local 580 and its controllers in the Luchese Crime Family were paid amounts of up to two dollars

per window for the approximately one million windows installed by companies controlled by members of the enterprise.

5. During the 1980's, the enterprise rigged bids on dozens of NYCHA window replacement contracts, controlled certain window manufacturing and installation companies and forced others out of the NYCHA and private sector markets through fear and intimidation.

<u>COUNT ONE</u>

(Racketeering Conspiracy)

<u>The Enterprise</u>

6. The enterprise, as that term is defined in Title 18, United States Code, Section 1961(4), was an association in fact which was engaged in, and the activities of which affected, interstate commerce, and consisted of:

a. Certain members and associates of the Luchese, Genovese, Colombo and Gambino Crime Families, organized criminal groups which operated in New York and other parts of the United States and were connected to a nationwide criminal organization known by various names, including "The Mafia" and "La Cosa Nostra," which operated throughout the United States through entities known as "Families." The Luchese, Genovese, Colombo and Gambino Crime Families were each such an entity. Each crime family operated through groups known as "crews." Each crew usually had as its leader a person known as a "capo," a captain, or boss of a crew, and was comprised of "made" members, sometimes known as "soldiers," and associates,

sometimes referred to as "connected people." Above the "capos" were the three highest ranking members of each family, who supervised, supported and protected the "capos." The head of each crime family was known as the "Boss." The "Boss" was assisted by an "Underboss," and a counselor, who was known as the "Consigliere." The duties and responsibilities of the "Underboss" and "Consigliere" were determined by the "Boss" of each crime family.  The "Boss," the "Underboss" and the "Consigliere" dictated rules and decisions that were imple- mented by the "Capos," "Soldiers" and associates;

b.   Certain officers, representatives, members and employees of Local 580, a labor organization, which represent- ed and would admit to membership ironworkers and other persons employed by commercial firms located in the New York City metropolitan area whose employees were employed in an industry affecting interstate commerce;

c.   Certain owners, officers, representatives and employees of window installation and manufacturing companies and other commercial firms located in the New York City metropolitan area and elsewhere which were engaged in an industry affecting interstate commerce.  Such companies and firms included, but were not limited to: Aluminum Shapes, Inc. (Aluminum Shapes); Aluwin Corp. (Aluwin); American Aluminum, Inc. (American Aluminum or Amer. Alum.); Arista Windows, Inc. (Arista); East Coast Windows (East Coast); Goldseal Mfg., Inc. (Gold  Seal);  Graham  Architectural  Products  Corporation

(Graham); Harry C. Partridge (Partridge); Mannix Industries, Inc. (Mannix); National Windows, Inc. (National); PECO Corporation (Peco); Recamp Builders, Inc. (Recamp); Slate Construction, Ltd. (Slate); SWS Industries, Inc. (SWS); Visor Builders, Inc. (Visor); and White Star Aluminum (White Star).

### The Defendant

7.  The defendant PETER CHIODO was employed by and associated with the enterprise by virtue of his membership in and association with the Luchese crime family and other crime families.  The defendant, by virtue of position, influence and reputation, was able to influence officials, employees and affairs of Local 580 and/or companies within the window manufacturing and installation industry.  At times material to this indictment the defendant PETER CHIODO was a "made member" and "Capo" in the Luchese Crime Family.

### The Purpose of the Enterprise

8.  The purpose of the enterprise included obtaining money and other things of value for the defendant and his co-racketeers in the following ways:

    a.  Through control of the affairs of Local 580, which control resulted in the receipt by certain defendants and their co-racketeers of unlawful payments of money and other things of value from and in the interest of window manufacturing and installation companies, other commercial firms and individuals in the New York City metropolitan area;

b.  Through the allocation of business and contracts to selected window manufacturing and installation companies which were controlled by members of the enterprise and from which certain co-racketeers demanded and received money and other things of value;

c.  Through the promise to owners, officers and employees of selected window installation companies of preferential treatment and lax enforcement or non-enforcement of collective bargaining agreement provisions, in exchange for which certain co-racketeers demanded and received payoffs;

d.  Through the monopolization, price-fixing and bid-rigging of window installation contracts offered and awarded by the NYCHA through a competitive bidding process;

e.  Through payoffs to Local 580 to use non-union labor in order to achieve an unfair competitive advantage in securing window installation contracts offered and awarded by private, commercial and governmental building owners and developers, and to increase their profits therein;

f.  Through concealing and attempting to conceal from law enforcement authorities the existence of the enterprise, the identity of its members and associates, the means through which it conducted its affairs and the locations from which it conducted its affairs;

g.  Through acts of violence, including murder; and

h.  Through the sale of goods in interstate commerce.

<u>Means and Methods of the Enterprise</u>

9.   Among the means and methods whereby the defendant and his co-racketeers conducted and participated in the conduct of the affairs of the enterprise were the following:

a.   Certain co-racketeers demanded and collected unlawful payoffs from window installation companies, other commercial firms and individuals;

b.   With respect to each of the four crime families that participated in the enterprise, high-ranking members of such families, including, in certain instances, the "Boss," "Consigliere" and "Underboss," as well as "Captains," "made" members and associates of the crime family, managed, directed, supervised, promoted and protected the criminal activities of the enterprise.   In return, those individuals received a share of the proceeds of the enterprise and other things of value;

c.   The defendant and his co-racketeers maintained their control and influence in the window manufacturing and installation industry by identifying the enterprise with organized crime, as well as by inducing fear of financial and economic injury, fear of work stoppage, fear of union organizing activities, and fear of violence and physical injury and by threatening and actually committing acts of violence, including physical harm and the destruction of property;

d.   The defendant and certain co-racketeers allocated window installation contracts and extended preferential treatment to selected window manufacturing and installa-

tion companies through lax enforcement and non-enforcement of collective bargaining agreements and through preferential treatment, including permitting the use of non-union workers, the payment of less than prevailing wages to union and non-union workers, and the non-payment or underpayment of contractually required employer contributions to the Local 580 welfare and pension funds, for which treatment payments were made and agreed to be made to Local 580;

e.  The defendant and his co-racketeers engineered, promoted and protected a scheme whereby selected window manufacturing and installation companies would combine and conspire to monopolize, collude, price-fix and rig bids submitted to the NYCHA for window contracts, and whereby other window manufacturing and installation companies would be excluded from the NYCHA window replacement market through the wrongful use of fear of work stoppage, fear of union organizing activities, and fear of violence and economic injury;

f.  The defendant and his co-racketeers engineered, promoted and protected a scheme whereby selected manufacturing and installation companies would combine and conspire to make payoffs to Local 580 to use non-union labor and threaten labor unrest in order to achieve an unfair competitive advantage in securing window installation contracts offered and awarded by private, commercial and governmental building owners and developers, and to increase their profits therein.

g.   The defendant and certain of his co-racketeers would attempt to conceal the existence of and their participation in their respective organized crime families and the enterprise through threats and acts of violence, including murder.

### The Racketeering Conspiracy

10.  From on or about and between January 1, 1978, and the date of the filing of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO and others known and unknown to the United States Attorney, being employed by, members of and associated with the enterprise described in paragraph 4 of this Information, which enterprise engaged in, and its activities affected, interstate commerce, knowingly, willfully, and unlawfully conspired to violate Title 18, United States Code, Section 1962(c), that is, they conspired to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as set forth below, in violation of Title 18, United States Code, Section 1962(d).

The Pattern of Racketeering Activity

11.  The pattern of racketeering activity consisted of Racketeering Acts 79, 81, 88, 108 and 109 as set forth in Indictment Cr. No. 90-446 and realleged herein, and Racketeering Acts 110-118 set forth below:

Racketeering Act 79

Labor Payoff

12.  On or about February 10, 1989, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO, and co-racketeers Vittorio Amuso, Anthony Casso, John Morrissey and Thomas McGowan, together with others, did knowingly, willfully and unlawfully request, demand, receive and accept, and agree to request, demand, receive and accept the payment of a sum of money in excess of One Thousand Dollars ($1,000) to, and for the benefit of, officers, representatives and employees of Local 580 from employers and persons acting in the interest of employers in an industry affecting commerce whose employees would be admitted to membership by Local 580, with respect to the installation of replacement windows in the Unity Plaza NYCHA project,      in violation of Title 29, United States Code, Section 186(b)(1) and (d), and Title 18, United States Code, Section 2.

Racketeering Act 81

Labor Payoff

13.  On or about February 22, 1989, within the Eastern District of New York and elsewhere, the defendant

PETER CHIODO, and co-racketeers Vittorio Amuso, Anthony Casso, John Morrissey and Thomas McGowan, together with others, did knowingly, willfully and unlawfully request, demand, receive and accept, and agree to request, demand, receive and accept the payment of a sum of money in excess of One Thousand Dollars ($1,000) to, and for the benefit of, officers, representatives and employees of Local 580 from employers and persons acting in the interest of employers in an industry affecting commerce whose employees would be admitted to membership by Local 580, with respect to the installation of replacement windows in the Betances Plaza NYCHA project, in violation of Title 29, United States Code, Section 186(b)(1) and (d), and Title 18, United States Code, Section 2.

## Racketeering Act 88

### Extortion

14. In or about February, 1989, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO, and co-racketeers Benedetto Aloi, Peter Gotti, Dennis DeLucia, Caesar Gurino, Vincent Ricciardo and John Morrissey, together with others, did knowingly and unlawfully obstruct, delay and affect and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, in that the defendant and others did obtain and attempt to obtain the property of Jade, its owners, officers and employees, to wit: the right to contract, including the right to bid competitively on NYCHA window

replacement contracts, said property being obtained and attempted to be obtained with the consent of Jade, its owners, officers and employees, such consent being indicted and attempted to be inducted by the wrongful use of fear, including fear of financial and economic injury to Jade, its owners, officers and employees, in violation of Title 18, United States Code, Sections 1951 and 2.  The extortionate conduct of the defendants and others included, but was not limited to:

a.   Causing Jade, its owners, officers and employees to fear economic injury by threatening to prevent installation of Jade windows in NYCHA projects, including but not limited to the United Plaza NYCHA project;

b.   Causing Jade, its owners, officers and employees to fear physical injury and injury to their property; and

c.   Causing Local 580 to threaten to prevent Jade from using workers of its choice to install windows on NYCHA project window replacement contracts.

### Racketeering Acts 108 and 109

### Mail Fraud

15.   On or about and between the dates set forth below, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO and co-racketeers Vittorio Amuso, Anthony Casso, Venero Mangano, Benedetto Aloi, John Morrissey, Thomas McGowan, Peter Gotti, Dennis DeLucia, Caesar Gurino and Vincent Ricciardo, together with others, having devised and

intended to devise a scheme and artifice to defraud, through bid-rigging, collusion, price-fixing and monopolization, whereby the City of New York and the NYCHA would be deprived of the economic benefits associated with the use of the competitive bidding process to avoid contracts to install replacement windows in NYCHA projects, and for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, did knowingly and willfully cause to be delivered by mail, according to the direction thereon, in violation of Title 18, United States Code, Section 1341 and 2, the following mail matter:

| Racketeering Act | Approx. Date of Mailing | Description of Mailed Matter | Sender | Addressee |
|---|---|---|---|---|
| 108 | 5/24/89 | Notice of Award Unity Plaza NYCHA Project | NYCHA | Mannix |
| 109 | 5/16/89 | Notice of Award Betances NYCHA Project | NYCHA | Graham |

### Racketeering Acts 110 to 114

### Murder

16.  On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO and others known and unknown to the United States Attorney, being employed by and associated with the enterprise described in Paragraph 1, would and did agree to commit, and to aid, abet, counsel, command, induce and procure the

commission of murders in violation of New York Penal Law Sections 125.25 and New Jersey Criminal Code, Section 2C:11-3, each act involving murder and conspiracy to murder constituting a separate act of racketeering, as follows:

a.   On or about October 25, 1988, within the State of New York, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder and aided and abetted the murder of Sorecho Nalo, a/k/a "Sammy", a/k/a "Sammy the Arab."

b.   In or about and between November, 1988 and December 7, 1988, within the State of New York, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder and aided and abetted the murder of Angelo Sigona;

c.   In or about and between the summer of 1988 and June 2, 1989, within the State of New York, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder and aided and abetted the murder of Julius Calder, a/k/a "Red Cameron";

d.   In or about and between early September, 1989 and September 17, 1989, within the State of New Jersey, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder and aided and abetted the murder of John "Sonny" Morrissey;

e.   In or about and between April, 1990, and May 17, 1990, within the State of New York, the defendant PETER

CHIODO, together with others known and unknown to the United States Attorney, conspired to murder and aided and abetted the murder of James Bishop;

### Racketeering Acts 115 to 118

### Conspiracy to Murder

17.   On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendant PETER CHIODO and others known and unknown to the United States Attorney, being employed by and associated with the enterprise described in Paragraph 1, would and did conspire to commit murder in violation of New York Penal Law Sections 125.25, each act involving conspiracy to murder constituting a separate act of racketeering, as follows:

f.   On or about and between late 1989 to early 1990, within the State of New York and elsewhere, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder Anthony Accetturo, Sr., a/k/a , "Tumac".   In furtherance of said conspiracy, in early 1989, PETER CHIODO and others travelled to Miami, Florida;

g.   On or about and between late 1989 to early 1990, within the State of New York and elsewhere, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder Anthony Accetturo, Jr.   In furtherance of said conspiracy, in early 1989, PETER CHIODO and others travelled to Miami, Florida;

h.   On or about and between late 1989 to early 1990, within the State of New York and elsewhere, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder Joseph Anthony Lamorte, Jr., a/k/a "Uncle Joe."   In furtherance of said conspiracy, in late 1989, PETER CHIODO and others travelled to Miami, Florida;

i.   On or about and between late 1989 to early 1990, within the State of New York and elsewhere, the defendant PETER CHIODO, together with others known and unknown to the United States Attorney, conspired to murder Joseph Martinelli.   In furtherance of said conspiracy, in late 1989, PETER CHIODO and others travelled to Brooklyn, New York.

(Title 18, United States Code, Sections 1962(d) and 3551 et seq.)

ANDREW J. MALONEY
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK