UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
UNITED STATES OF AMERICA, :
- versus - :
PETER CHIODO, Defendant :
--------------------------------X

**Docket#** 90-cr-446(RJD)

U.S. Courthouse
Brooklyn, New York

September 11, 2007

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE RAYMOND J. DEARIE
UNITED STATES CHIEF DISTRICT JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Roslynn R. Mauskopf, Esq.**
United States Attorney

BY: **Patricia Notopoulos, Esq.**
Assistant U.S. Attorney
One Pierrepont Plaza
Brooklyn, New York 11201

**For the Defendant:** **Kenneth I. Wirfel, Esq.**

**Official Transcriber:** **Rosalie Lombardi**
**L.F.**

**Transcription Service:** **Transcription Plus II**
821 Whittier Avenue
New Hyde Park, N.Y. 11040
(516) 358-7352

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

**Proceedings**

THE CLERK: 90-cr-446, United States v. Peter Chiodo.

Please state your appearance.

MS. HERMOZI: Patricia Notopolous and Mitra Hermozi for the United States.

Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. WIRFEL: Good afternoon, your Honor.

Kenneth I. Wirfel for Mr. Chiodo.

THE COURT: Good afternoon, everyone.

(Pause in proceeding)

THE COURT: Welcome back. I can't imagine it's been -- I don't know how many years since I have seen you but certainly almost 17 years since you entered your plea. Wow.

Are we ready to proceed, Mr. Wirfel?

MR. WIRFEL: Yes, your Honor, we are.

THE COURT: Mr. Chiodo, have you had an adequate opportunity, sir, to carefully read the presentence report and related materials?

MR. WIRFEL: If I may comment, your Honor, I have discussed it with him. I have read it to Mr. Chiodo and discussed it with him on a telephone conversation approximately a month ago. He did not personally review the document but we discussed it at some length.

**Proceedings**

THE COURT: Okay. Understanding the logistical difficulties, I certainly can understand that but I would be more comfortable if you took a few moments now.

MR. WIRFEL: Yes, your Honor.

THE COURT: there is -- I'm going to hand you the principal documents which is the presentence report. You have, of course, seen the government's letter of September 7, Mr. Wirfel?

MR. WIRFEL: Yes, your Honor. I might add that since there was an addendum to the presentence report --

THE COURT: Right.

MR. WIRFEL: -- it was only the addendum that Mr. Chiodo had not seen.

THE COURT: That's what --

MR. WIRFEL: He had seen the initial presentence report some time ago.

THE COURT: Well in a technical sense, the

MR. WIRFEL: Yes, your Honor, I just wanted to clarify that though.

THE COURT: In a technical sense, the report that I am working off dated July 3, 2007, it's an updated report, not an addendum, as I understand it. That's the way it's characterized.

In addition to the report, in the back you will see the probation department's now rather dated

**Proceedings**

recommendation but I will show it to you in any event. There is also given his status, confidential memoranda to the Court. Let me show those to you, as well. None of this will come as any great surprise to you but I think you should take the time.

If you would prefer to sit --

THE DEFENDANT: Okay.

THE COURT: Okay.

(Counsel and client confer)

THE COURT: Are we ready to go then?

MR. WIRFEL: Yes, your Honor.

THE COURT: In addition to the reports which you have now examined, my file reflects a transcript of the original plea back on December 6, 1990 that I took and most notably, a copy of the superseding information. I'm not so sure if you've seen this. Again, this is another confidential memorandum dated May 6. It's not terribly substantive but let me show it to you in any event.

I have, as you've commented, the original report, this was -- goes back to March 28, 1991, a copy of the plea agreement and this, I take it is the -- what has been referred to --

MS. NOTOPOULOS: It would be dated July 11, 1991, your Honor, the cooperation agreement.

**Proceedings**

THE COURT: No, this is the original cooperation agreement but I do have the operative one, as well. This case is so old, you should know that it was pre-guidelines. In fact, I have the sentencing panel's recommendations here, I think, a practice we're going to be returning to shortly. Again, they're somewhat dated in light of history.

And then finally, the government's letter of September 7, 2007; the government moves pursuant to of 5k1 of the guidelines but my question, is this a guidelines case?

MS. NOTOPOULOS: Your Honor, I knew that it was a 20 year cap. It may well have been a pre-guidelines plea. Therefore, obviously the letter should speak to our desire to have the Court grant Mr. Chiodo lenience but obviously to the extent the Court still considers the guidelines' help in deciding sentence, we would go by the standard of 5k1.1.

THE COURT: Well, I think in light of the full range of circumstances, it is more an academic question than anything else, in light of what the government has said and in light of my own experience with Mr. Chiodo. Were it a guidelines case, I would grant the motion to depart.

The more difficult question, of course, becomes

having done that, where under these very unusual circumstances, essentially in my experience unprecedented, where do we go from there.

And with that, Mr. Wirfel, I will turn it over to you.

MR. WIRFEL: Thank you, your Honor. If the Court will indulge me, I would just like to make what may be described as a few personal statements with regard to this matter because I view my representation of Peter Chiodo of being perhaps one of the most significant matters that I have handled either as a prosecutor or defense attorney in the federal courts.

As your Honor may recall, I joined the United States Attorney's Office in this district in 1979. The first week I came to this office, I was assigned to represent the government in an appeal from a conviction in the district court entitled United States v. Chiodo. Mr. Chiodo had been convicted of a theft from an interstate shipment of a truckload of liquor and sentenced to prison and the first appellate brief I handled as a government attorney was the appeal brief from that conviction. I might add that it was affirmed.

Subsequent to that, many years later, approximately ten, perhaps 11 years later, after I had left the office, I received a phone call from a former

Case 1:90-cr-00446-FB Document 1201 Filed 12/21/09 Page 7 of 37 PageID #: 170



colleague and dear friend, Charles Rose, who was the chief of the organized crime section in the United States Attorney's Office at the time asking me if I would do him the courtesy of meeting someone who was interested in my representation of him and he could tell me no further information.

So that afternoon at his request -- there was more in the conversation but I will try to keep it to its bare essence, I went downstairs from my office and met Special Agent John Flanagan (phonetic) from the FBI, who I knew and was driven to a hospital here in the metropolitan area where Mr. Chiodo was grievously ill from a series of gunshot wounds he had suffered just days before.

Apparently there was a universal recognition that Mr. Chiodo, if he was going to consider cooperation with the government, could no longer rely on the honest services of his former counsel. And given his brief knowledge of me from my handling of the government's appeal, and the government and Mr. Rose's and Mr. Greg O'Connell's (phonetic) knowledge of me from my prior service in the office, I believe that both Mr. Chiodo and the government realized that I would be an honest broker and perform legal services to the best of my ability and standards to which we must all adhere.

So since 1979, effectively, I know Mr. Chiodo. Since 1991, I have represented him in this matter. And now approximately 16 years later, I stand before this Court arguing on his behalf at sentencing. I might also add this is somewhat of a coda of my legal career since I have cut back significantly in my practice but because of my relationship, there was no doubt that when Mr. Chiodo called and Ms. Notopolous called, that I would come and fulfill my responsibility to him and to the Court.

That brings us to the history of this case and the crimes for which he is convicted and stands before the Court today. As I said, he -- and as I know the Court also observed Mr. Chiodo during those first weeks and months after the, what I will call the assassination attempt in Staten Island, was grievously injured and his own health and life was in doubt as to his recovery and his life expectancy at that time. He suffered a minimum of eight wounds, perhaps as many as 12 but it was impossible for the physicians to totally match up the entry and exit wounds that he did suffer in his body.

For a period of months, he was in various hospitals in the New York metropolitan area receiving treatment. He required years and years of rehabilitation. I know your Honor will recall because it was so dramatic, that as the first cases of his former

colleagues went to trial, how he came to court in a wheelchair unable to stand and unable to move most of his limbs, albeit only with great difficulty.

In fact, as Ms. Notopolous so dramatically points out in her letter to the Court, there was a time that he was testifying effectively back to back in two proceedings; two different trials in this courthouse or its predecessor courthouse, when he was taken from one room to another in a wheelchair to testify.

I recall from my observations of him at the time how tremendously, physically difficult that was for him. How he was committed to the path that he had agreed to follow and how he never swerved from that and he gave everything that he had physically and emotionally to fulfill his obligation to the government at that point.

I might also add, I got to spend obviously many, many months with Mr. Chiodo. I am in no sense am going to minimize the conduct for which he has been convicted and freely admitted to this court. There's nothing that can be said, that I can say, that can make up for the suffering that some people suffered, even if it was not directed at his hand but that he knew of and may have exceeded to or agreed to.

But I came to recognize that Mr. Chiodo was an exceptional person who had followed a wrong path in life.

I don't excuse it. We can get some sense of the understanding of a socioeconomic background that may have led him from perhaps coming from the wrong side of the tracks to follow the life or the path of crime that he did for so many years.

But I had no doubt from early on that if this man had been directed and guided in the right direction, he would have been a leader of industry, he would have been a true leader in his community. He could have done great things. It did not happen. But I saw him as an exceptional person. He was not a street thug. The waste of his talent and ability was all the more tragic because of that.

The other thing I will say about Mr. Chiodo in that regard and we discussed it briefly this afternoon before coming to court because our ability to communicate has been so seriously limited by a series of telephone calls that are triangulated through the marshals or perhaps internet access at various times. And anyone who is in private practice or even a federal defender or a criminal justice act attorney from time to time, will represent people who are so-called cooperators.

And it is not unusual as the Court knows full well, to see people who minimize their conduct, who rationalize their conduct who perhaps even excuse it or

deny it. I will tell you that and Mr. Chiodo and I discussed this very point, how dramatic it was to me that once he made the agreement to cooperate with the government, there was no turning back. There was no holding back. There was no hesitation. It was a fundamental seat change in his life and a direction from which he has never regretted making, despite all of the hardships he has endured.

That to me is by itself exceptional. I don't mean to talk to the detriment of my or any other client or anyone else's client, but I think we can all -- we've all seen that. I think it was also recognized by almost each and every jury of each and every judge that he appeared before how freely he admitted his conduct, the wrongfulness of the conduct, and despite the efforts of scores and scores of some of the most talented defense attorneys in this City, that he freely acknowledged his conduct, did not flinch from it, gave jurors and judges and prosecutors no reason to disbelieve him or to think that he was doing anything other than freely admitting his conduct and acknowledging the role of others.

Your Honor used the terms that his conduct, if I recall correctly, was exceptional. I mean, it's almost -- I would say almost unheard of. Looking back 15 years, we may now have become a little, I don't know if blase is

the right word, but perhaps used to the fact that the so-called "Code of Silence" has been broken in the Mafia by others.

But at the time in 1990 and 1991, that Mr. Chiodo set down that path and agreed to become a government witness, that was literally unheard of. He was, if I am not mistaken, the highest ranking member of any Mafia family, I believe in the United States, certainly in New York to come forward and to freely admit his role and to testify against others. It was the quintessential first crack in the dam.

What came after him in certain part, perhaps in a very large part, is due to his decision to move in that direction.

(Counsel and client confer)

THE DEFENDANT: I'm sorry, your Honor.

THE COURT: No need to apologize.

MR. WIRFEL: As your Honor knows from your own memory of these trials in which you presided in at least several instances and from Ms. Notopolous' letter, there are over 20 convictions that the FBI directly attributes to his testimony, including if I am not mistaken, the bosses and under bosses of two of the five crime families here in New York City. He was a critical, in some instances, the sole witness against some of these

individuals whose testimony was found to be highly credible time and time again.

I am not one to try to push under a table or hide under a rug the seriousness of the crimes for which he was convicted but I remember and Mr. Chiodo and I spoke about it today, after Charles Rose and I met with him when he was weighing his decision, we both urged him that if he was going to follow this path to recognize how much and how important it was that he be truthful in every respect.

Even though he had pleaded guilty to the indictment, which was then standing against him, and which almost certainly led to the assassination attempt by his former colleagues, the government did not know anywhere near the extent of his involvement in some of these activities. And remarkably, when Mr. Chiodo and I sat down, he acknowledged to me his role either in passing information or in supervising or in somehow furthering what became the efforts to murder and in some instances, the successful efforts to murder several of his colleagues for one reason or another. This was not known to the government; his role was not known to the government.

We both remarked today how we came in with some trepidation to the United States Attorney's Office to

present this information because it was going to be part of the agreement that we would be obliged to keep. This information came from Mr. Chiodo before the government knew it. His plea agreement specifically refers to some of those charges, primarily if not exclusively due to his own admissions. We don't take them back. They stand there. They are accurate. And he must be judged by this court because of them. We recognize the heavy burden that he was putting on himself and the decision that he was making.

As Ms. Notopolous points out, remarkably, 16 years later, Mr. Chiodo is still providing historical information to the government. He has been called recently either to testify or to prepare to testify. It has been one of the most remarkable efforts to assist the government that I have ever seen, at least in this metropolitan area.

On a more personal note and obviously most all of us, even those of us who would consider ourselves old timers are now very used to the guidelines and we're very used to the exceptions to the sentencing guidelines that the Court will consider, it has always been pre and during and post guidelines ones where the Court could consider the personal hardships that one would suffer.

First, as your Honor well knows, when

Mr. Chiodo agreed to cooperate and consider the witness security program which he ultimately entered, he had a number of members of his family residing in the New York area. He had parents. He had a sibling. He had his own family. The dislocation that they were all going to suffer was one this court has seen on other occasions also. One family member, believing that she was not at risk, decided -- opted to stay in New York, his sister, and she almost paid for that with her life. She herself in an act of retribution or vengeance against Mr. Chiodo was shot by one of his former colleagues and thankfully she lived to testify against that individual as Mr. Chiodo came back from witness security at the government's request and testified also.

When Mr. Chiodo was literally a cripple and could not fend for himself, the person who was at his bedside the entire time was his wife, Philomena (phonetic). I have very strong memories of how devoted she was to him throughout this period; feeding him, bathing him, nursing him, giving him the love and attention that all of us would be blessed to received, God forbid we were in a similar situation.

The roles have reversed now. While Mr. Chiodo has regained a good deal of mobility, he does not have all of it, but his wife has suffered a serious stroke and

he is now her nurse and primary caregiver. There is not money in the family to pay for private duty nursing, home care. There is one adult daughter. As your Honor, I believe understands also, Mr. Chiodo's suffered a tragedy that his son who accompanied them into the witness security program and who grew to have his own family and children was the victim of a hit and run driver last year and died, pursuant to that accident.

Mr. Chiodo has limited income. He did remarkably, as I referred to his intelligence, continue his education. He gained a professional degree, although he has not been able to use that for gainful employment on a regular basis. But it is a mind that is sharp and clear and he tries to be a giving member of his community.

And your Honor has, I think, one of the most difficult choices that you've had in a sentencing. I have never envied federal judges and the decisions you've had to make about people's lives. And again, I am not going to ask the Court to forgive Mr. Chiodo for what he's done because no one can. But to recognize the efforts over 16 years that he has made to contribute to the government's success, to turn a page in his life, to make himself and his family whole and to be a law abiding and decent member of our community.

I did receive a sharply redacted letter from Mr. Chiodo's doctor. He is still suffering the effects of his injuries now 16 years later. He needed repair of certain injuries which require him to have chronic pieces or the permanent pieces of mesh from which he can suffer infection on a regular basis. He needs to get treated with antibiotics on a regular basis. He has as he is no longer a young man, he does have other issues with his adrenal gland, he has an enlarged heart, he suffers from gallstones and some of these are slated for some surgical procedures to remove certain risks or discomfort. And it must be noted also that the gunshot wounds still limit his mobility significantly and a are a source of chronic pain.

I could stand here for much longer; I won't. I have made the mistake that many lawyers can hopefully avoid of becoming a friend to a client, someone that I respect and would like the suffering to end and I ask the Court to take all of this into consideration.

THE COURT: Before we go forward, could I have my reports back? Do you have them there?

THE CLERK: Yes, they're there. Yes, you do have them, Judge.

THE COURT: You got them back from the lawyers?

THE CLERK: Yes.

MR. WIRFEL: Yes, yes.

THE CLERK: (inaudible).

MR. WIRFEL: There were several confidential memorandums, your Honor.

THE COURT: Yes.

MR. WIRFEL: I believe you have all of those.

THE COURT: I beg your pardon.

Ms. Notopoulos?

MS. NOTOPOULOS: Yes, sir. Thank you.

THE COURT: Wait, wait.

MS. NOTOPOULOS: Oh, I am sorry.

THE COURT: No, I am not sure I beg your pardon. What the heck?

MS. NOTOPOULOS: That's still being an accused.

THE COURT: Are you sure you gave me everything back? Not you, the lawyers?

MR. WIRFEL: It could have been a confidential memorandum. I just want to see if he checks that they have those here. I have none of those here on top.

MS. NOTOPOULOS: Judge, would you like my copy in the interim until we sort this out?

THE COURT: It's gotten that bad, huh?

MS. NOTOPOULOS: My only copy.

THE COURT: Yes, I would because mine seems to have walked away.

MS. NOTOPOULOS: Here. Also --

THE COURT: Thank you. This looks an awful lot like my copy.

All right, Ms. Notopoulos?

MS. NOTOPOULOS: Yes, your Honor, thank you. I understand Ms. Hermozi graciously put my appearance on the record. I don't know if she was recognized as being here as the Chief of the Organized Crime and Racketeering section of the office.

THE COURT: All right.

MS. NOTOPOULOS: Present also from the office is Greg Andres, Chief of the Criminal Division, Deputy Chief of the Organized Crime Section, Joey Lipton. I also want to recognize, I beg the Court's time to recognize other individuals who are here because I think it's important to note the support of people that have come here today.

Supervisory Special Agent of the Lucchese squad, Michael Dressler (phonetic) is here. Special Agent Kathy Batt (phonetic) who is Mr. Chiodo's current handling agent, agents who handled Peter Chiodo from the very beginning and are here for this type of ending, Luke Andolfo (phonetic) and John Flanagan who have since retired and yet come back to show support. Special Agents Lou DiGregorio (phonetic) and Ted Oddo (phonetic)

are also here from the FBI. I also note even paralegals, your Honor, Linda McNeil (phonetic), Sam Nole (phonetic), Catherine Hudack (phonetic); I think that's extraordinary because when the government tries cases of the nature that Mr. Chiodo has become involved, they've put their heart and soul into these cases and they, too, see the contribution and sacrifice that Mr. Chiodo has brought.

If spirits are among us, your Honor, I am sure that Charles Rose is here today. And also, AUSA Gregory O'Connell is here. Mr. O'Connell and Mr. Rose, as defense counsel has indicated, were the original, as the Court is well aware, assistant United States attorneys that deal with Mr. Chiodo when he first cooperated. I know that Mr. O'Connell would like to say something to the Court whenever the Court feels -- if would like to hear from Mr. O'Connell and whenever the Court feels that that's appropriate.

THE COURT: He can do that now. I see him there.

MR. O'CONNELL: Your Honor, this takes us way back. I don't want to spend time rehashing what Mr. Wirfel so eloquently said to the Court on behalf of Mr. Chiodo but I do want to re-emphasize one point to place in context Mr. Chiodo's cooperation back in 1989,

1990, 1991. At that time, a reason this court should consider for distinguishing Mr. Chiodo's cooperation apart from so many other cooperators who have since come into this courthouse or the courts over in the southern district, at that time in 1990 when the "Window" case, for example, was first indicted, we had no made members of organized crime in New York cooperating with the government. The case -- the "Window" case was predicated largely as your Honor will recall, on the assistance of an associate in the Genovese crime family at the time, Peter Savino, along with Bobby Faranga (phonetic).

But at that time, there was a birth of assistance from the ranks of organized crime. A few years before there was an individual named Fish Cafaro, who was a Genovese soldier/captain at times, who had cooperated on and off but it really led to no where. We had met with him, Charles and I, before the indictment of the "Window" case and before its trial and we found him to be of little assistance, notwithstanding that we had high ranking Genovese crime family members indicted in that case.

So when Mr. Chiodo pled and then later was the object of a failed execution attempt by Anthony Casso and Vic Amuso and the Lucchese crime family, we really were at a point in the war against organized crime where we

didn't have much in the way of resources, other than the tapes we had, wiretap capabilities that we had, source information that the bureau had, but we didn't have witnesses from within the ranks of organized crime who could reveal the devastating type cases that could be brought against them involving principally homicides that would carry mandatory life sentences under the guidelines and life sentences in the ordinary course in the preguidelines era.

And when Pete Chiodo survived his shooting, and we do remember as Charles used say it often, it was I believe 12 shots and 15 entry and exit wounds, he survived, he fearlessly took on his immediate supervisors in the Lucchese crime family, namely Anthony Casso and Vic Amuso by becoming a cooperator who I think widely throughout the ranks of the LCN at that time were viewed as among the most fearsome and treacherous in organized crime; Gas Pipe Casso, in particular. And Mr. Casso was Mr. Chiodo's direct superior in that crime family. Mr. Casso was involved in homicides that Mr. Chiodo was able to inform the government about and later juries and trial testimony. And Mr. Chiodo's assistance really led to breaking down that wall of silence which existed at that time. So for that reason alone, his cooperation is unprecedented.

And in this law enforcement, crazy world of ours, from a government's point of view, whether there are risks and there are rewards, I believe that and unprecedented performance by a cooperating witness such as Mr. Chiodo should be greatly rewarded. And I could cite, for example, after Mr. Chiodo signed the agreement, it was within just a few months that -- actually within a year of his cooperation becoming public and his testimony, Al D'Arco, the acting boss in the Lucchese crime family came in as a cooperator. Sammy Gravano signed up as a cooperator and testified as you know, in many cases included the case against John Gotti. Mr. Chiodo testified against bosses of crime families including his own crime family, and Amuso, Chin Gigante from the Genovese crime family. And over time with his assistance, a legion of cooperators from the Lucchese family, from other crime families, came forward and enabled this office in the eastern district to have unprecedented success in its war against organized crime.

So as a historical matter, Mr. Chiodo's cooperation truly stands out and he's peerless for that reason alone. And I think that he should be rewarded for his cooperation. Apart from everything that Mr. Chiodo's counsel, Mr. Wirfel, had to say, it's really the message that goes out to the street that counts the most. And

the reward that he's entitled to, I think, in our system of justice really should be measured against the legion of cooperators who followed him and assisted both the Southern District and the Eastern Districts of New York and their great successes in the war on crime and essentially dismantling two generations of leadership of all of the crime families.

THE COURT: Thank you, sir.

MS. NOTOPOULOS: Your Honor, if I could continue, I also want to note that tragically we have a person here today who never would have wished to be in the position of needing to be here and that is that there is a Ms. Rosalie Sagona, who is the sister of a murder victim, Angelo Sagona. She simply wants the Court to know that her presence is in the courtroom, your Honor.

Your Honor, Peter Chiodo signed a cooperation agreement, as I said earlier on July 11, 1991. 16 years and two months exactly later, we are here for this proceeding. The government filed a 5k1.1 letter, although no guidelines apparently are applicable. Obviously the spirit of that letter indicates that we are seeking cooperation -- I'm sorry -- leniency for Mr. Chiodo.

His sentencing guidelines as calculated by the Department of Probation exceeds the statutory maximum of

20 years. In my letter, I indicated that Mr. Chiodo's cooperation was substantial, if not extraordinary. I just want to take a few minutes to indicate why I used that word extraordinary which I have never used before in my 16 years doing organized crime in this office for a cooperating witness.

I have never in my experience, and I don't think there's anybody here that would disagree, has never before has a cooperator accomplished more through cooperation and sacrificed more because of it. I don't want to belabor the facts in the government's letter. Mr. Wirfel has drawn the Court's attention to the fact that the FBI attributes 22 convictions to Mr. Chiodo. But it's the quality, more than the quantity that strikes me. Bear in mind that in most cases, Mr. Chiodo, as been said before, was a primary witness, usually the only witness to a murder for which numerous, numerous people were convicted. And who was convicted? There were two mob bosses; Vic Amuso is spending his life in prison based on murder convictions that were obtained through -- almost solely Mr. Chiodo's testimony. Vincent Gigante was convicted of charges stemming from the "Windows" case and later perjury charges. He's been sentenced to 15 years in jail and died in prison.

One mob boss cooperated with the government, Al

D'ARco and no doubt that was influenced in part by Mr. Chiodo's courage and in part by evidence that he would have known Mr. Chiodo had on him. That cooperating witness who was an acting street boss of the Lucchese family brought many convictions to the government himself.

We also had the Greek Godfather, a leader of his own group, Spirous Valencas (phonetic), who is also in jail for the rest of his life. We had the underboss of the Lucchese family, Anthony Casso, who pled guilty to multiple murders, no doubt aware that Chiodo's testimony, had he testified at his trial, would have been devastating. He is in jail for life after a failed cooperation attempt.

Most of Chiodo's crew members are also in jail; Richard Pagliarulo (phonetic), who ventured to go to trial is spending -- died in jail having been sentenced to life for his commission of multiple murders. Michael DeSantis sentenced to 252 months incarceration. Frank Lastorino (phonetic) 216 months, George Cippolla, 22 years, George Conte, 264 months, Michael Spinelli, 264 months; all for murders, murder conspiracies and crimes of the worst order. And all of them, I believe, can be -- would not have been had had it not been for Mr. Chiodo's cooperation. Quite simply, he took down the

administration of the Lucchese family and a good piece of it.

I would like to say a few words about the murders in which Mr. Chiodo is charged. Your Honor, Mr. Chiodo initially pled guilty in the "Windows" case before the Court. He probation report in that case which was a guideline case reflected a 78 to 97 month guideline sentence. At the time Chiodo decided to cooperate and I've checked this numerous times with various law enforcement agents, the government had no evidence to charge Mr. Chiodo with any murder and I dare to say, we were not aware of any murders he had committed beyond perhaps a generalized suspicion based on his position in the family. Yet when he chose to cooperate, he advised the government of all of the murders and murder conspiracies in which he had participated and he opened himself up to the 20 year sentence that he faces today. These were horrible crimes. The worse a man can admit -- commit. However, in mitigation, as has been noticed, Chiodo was never the shooter. He conspired to murder some being ordered by his superiors to kill others. Quite frankly, as crazy as Anthony Casso was, on pain of death would he have suffered had he not followed those orders. And he assigned other crew members to carry out the contracts. He also aided and abetted in other

murders by surveilling targets in helping to set them up but never himself was he a shooter.

No one can understand the pain that this activity has brought to the victim's families and certainly to Ms. Sagona who is here today. We understand their desire for justice and punishment no doubt to the fullest degree of the law. However, the government and law enforcement stands in a different place. We have to deal with the harsh reality that in organized crime cases, witnesses do not come forward, wiretaps are often unavailing and most often, it is only through cooperation that individuals -- of individuals like Mr. Chiodo who can bring people to justice for murder if they are involved in organized crime.

In order to encourage and reward that cooperation, we seek lenience for those cooperators. I would note that only through Mr. Chiodo's cooperation did we learn that Gas Pipe Casso order the murder of Mr. Sagona. Mr. Casso is jail for life. Only through the cooperation of Mr. Chiodo did we learn that Richard Pagliarulo shot and killed Mr. Sagona in a car that was driven by Michael DeSantis. Mr. Pagliarulo was sentenced to a term of life imprisonment and he died there. Michael DeSantis is serving a 252 month term of incarceration because he pled guilty.

By exposing himself to a stiffer sentence, your Honor, I would say that that was a sacrifice on Mr. Chiodo's behalf. Mr. Chiodo also when we talked about sacrifice as has been duly noted by several people suffered debilitating injuries when he was assassinated. I know the Court witnessed first hand his disabilities as he would testify in a wheelchair. Earlier on, he was in a very weakened condition. He withstood days and days of stiff cross-examination. He was exhausted. It could not have been good for his health.

Worse yet was the shooting of his sister. In the wake of cooperation, we tell the Court all of the time that organized crime cooperators bring danger to their families. Peter Chiodo's wife, father and uncle were targets of unsuccessful attempts to retaliate against Chiodo's cooperation. Then in 1991, he was successful -- I'm sorry, in 1991, the leadership of the Lucchese family was successful in obtaining some retaliation in shooting Chiodo's sister in the neck and the back. Fortunately, she survived.

But this danger, your Honor, became real. Yet through all that, Peter Chiodo persevered as a cooperating witness. I believe from my 16 years of knowing Peter Chiodo that his motivation was not just to receive a reduced sentence but to make amends for his

past deeds. And I believe that that is why Mr. Chiodo was able to -- or why he sacrificed so much and persevered in light of all of these things that happened.

I mentioned to the Court accomplishments in sacrifice as a Chiodo's cooperation. Others have accomplished a lot but I don't know anyone who has accomplished this much. And I am aware of no one who has sacrificed this much. This is why in my letter, I ventured to say that Chiodo's cooperation was not just substantial but extraordinary.

THE COURT: Mr. Chiodo, what would you like to say, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: What would you like to say?

THE DEFENDANT: Well, I dare say I am very overwhelmed being here today. This occasion has brought back the past and as I look around the courtroom, I see people that have helped me to get where I am now. You know, it's not often that you get a do over in life and I tried every part of my being to become a human being that this court, this nation and the people that have helped me could be proud of. Though I am not rich, I am because my life is dedicated to that now. These men that stand behind me that are here on my behalf of the people here have shown me what true honor is and what people of honor

are about.

I can't even start to describe my feelings for them and the things that they have done to make me see the errors of my ways and how to correct that. I tried at every instance, every request that the Court and the government had to do my utmost and to tell the truth and to help as many times as I could. I think back to the days where the marshal service was -- had the responsibility of bringing me from one place to the other when I was in the wheelchair and the extraordinary efforts that they made on my behalf.

I thought about this day for a long, long time and I really never thought it would be -- thought it would come. I just thought I might not live to see that day. I am so glad that I am still here to look you in the eye and to tell you that the Peter Chiodo that existed before 1991 doesn't exist anymore. I can't even remember what he was like and my life since then, I feel I could be proud of and everybody else that helped me could be proud also. Thank you.

THE COURT: Well, I too have been waiting for this day. Every once in a while I would hear your name. I would hear rumors that you're in the courthouse that you're testifying here or there. One time, I don't think you even know it, I caught a glimpse of you. Year after

year I would tell my law clerks about Pete Chiodo and the "Windows" case and our time together in White Plains. It's not the kind of thing you forget.

I remember you on the witness stand up in White Plains very vividly and how difficult it was for you physically. I remember that very vividly. I remember thinking to myself that this is -- this seems like more than a guy trying to work off a sentence because you were in such discomfort. I also remember how some of the best lawyers around took their shots at you and comfortable as any cross-examiner would be with the fact that the witness is going to tell the truth and in a way treated you from a trial lawyer's perspective and the trial judge's perspective, treated you cautiously and with respect. I remember that very well.

I don't -- as I said, I have known this day was coming and I haven't looked forward to it, all the while realizing that you've been testifying successfully. I have spoken to my colleagues, some of whom have had you in their courtrooms. I, myself, recall the testimony. You were a very strong witness. You impressed them all. And as Mr. Wirfel said, everyone entertained the same thought; what would have happened had Peter Chiodo chosen a different path. Your success within the realm of the confines of organized crime was no doubt in part due to

your intelligence. The successes you would have almost inevitably enjoyed in private life outside of organized crime is one of the things you've lost as a result of your conduct.

Now, the family, when I think how difficult it must be to be -- to lose contact with family members, become estranged and then have to deal with the fact that your own sister was assaulted in what is from my money, the most extraordinarily wanton act of violence and cowardice that I have ever witnessed in fact or fiction and how you have to carry that with you. I remember her testifying. I remember the fear, even in the courtroom, protected by marshals and agents and the Court; the fear was there. It was palpable. She has you to thank for that. That's another one of your losses.

Of course, the physical injuries you've suffered speak for themselves. I can't help but say that you know, on a day that we mourn and remember thousands of people who were killed a very short distance from where I sit, who mourns and remembers the victims of your crimes; just a few lonely family members. You've got that to carry with you, too.

I don't ignore the positive side. From everything Ms. Notopoulos says, you presented an unprecedented record of success in the hard currency of

law enforcement. You were a sugar daddy, to say the least. Your cooperation was likely a watershed of that, to the demise of much of organized crime. You sort of underwrote the culture of the so-called code of silence and brought others in behind you. I don't diminish that at all. I really don't.

But the hard reality is, I have to make a judgment here based upon what everybody says, based upon this long, torturous period for you, your family, for the victims and their families and one that I hope will not be misinterpreted by angry family members.

Now I can impose a sentence but I have to tell you, I don't find the whole thing very satisfying. How explains this to Rosalie -- is it Sedona (sic)?

MS. NOTOPOULOS: Sagona, your Honor.

THE COURT: Sagona or to Linda Calder and others? I'm not able to explain it to them other than to demonstrate what you have accomplished and you've made the world a little safer.

So I am going to sentence you to five years probation. I do it with difficulty. I do it, as I said, without sense of satisfaction but I acknowledge how far you've come.

The very first day I met you when you were very uncomfortable, and we had just a minute to chat while

people were lining up, court reporters and things of that, somehow we got into talking about what you might do down the road and you mentioned architecture. This is like 16, 17 years ago. And at the moment, it sort of went in one ear and out the other. I figured it was a pipe dream, somebody out to impress me. But here we are and you meant it. You accomplished it and I can't do anything in that regard but tip my hat to you.

THE DEFENDANT: Thank you.

THE COURT: I hope you understand why I feel so uncomfortable about this and I wish you well. A $50 special assessment. There will be no fine.

Anything else?

MR. WIRFEL: I would just comment in case anyone else is reviewing this, your Honor, I don't believe restitution is mandatory under the sentencing --

THE COURT: It isn't -- in light of the report, there will be no restitution.

MS. NOTOPOULOS: Your Honor, there is the underlying indictment, 90-cr-446, that the government moves to dismiss.

THE COURT: The application is granted.

MS. NOTOPOULOS: And I suppose Mr. Chiodo could be advised of his right to appeal, although obviously --

THE COURT: If you want to appeal, you should

have your head examined but you have the right to do so.

MR. WIRFEL: Your Honor, you took the words out of my mouth.

THE COURT: But you have the right to do so. Take care of yourself.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **15th** day of **October** , 2007.

-----------------------

Rosalie Lombardi
Transcription Plus II